**LAW OFFICES OF RONALD A. MARRON**
RONALD A. MARRON (SBN 175650)
*ron@consumersadvocates.com*
ALEXIS M. WOOD (SBN 270200)
*alexis@consumersadvocates.com*
KAS L. GALLUCCI (SBN 288709)
*kas@consumersadvocates.com*
LILACH HALPERIN (SBN 323202)
*lilach@consumersadvocates.com*
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO

|  |  |
|---|---|
| JOSEPH CASILLAS, individually and on behalf of all others similarly situated, | Case No: |
| | **CLASS ACTION COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| DON'T RUN OUT, INC. D/B/A PUBLIC GOODS | |
| Defendant. | |

Plaintiff JOSEPH CASILLAS ("Plaintiff") on behalf of himself and all others similarly situated, by and through his undersigned counsel, hereby sues Don't Run Out, Inc., D/B/A Public Goods ("Defendant" or "Public Goods") and, upon information and belief and investigation of counsel, alleges as follows:

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because at least one member of the class, as defined below is a citizen of a different state than Defendant, there are more than 1,000 members of the class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

2.     The Court has personal jurisdiction over Defendant because Defendant transacts and does business within this judicial district and has committed the acts complained of below within this judicial district.  As a result, Defendant is subject to the jurisdiction of this Court pursuant to the laws of this State and Rules 3 and 4 of the Federal Rules of Civil Procedure.

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the injury in this case substantially occurred in this District.

4.     Intra-district Venue: A substantial part of the events and omissions giving rise to the violations of law alleged herein occurred in the County of Solano, and as such, this action may properly be assigned to the Sacramento division of this Court pursuant to Civil Local Rule 120(d).

## PARTIES

5.     Plaintiff Joseph Casillas ("Joseph Casillas" or "Plaintiff") is a resident of Vallejo, California, which is located in Solano County.

6.     Defendant Public Goods is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 85 Delancey, New York, New York, 10002.  Public Goods is advertised as a healthy and sustainable company that provides products free from harmful chemicals that contribute to pollution.

**FACTUAL ALLEGATIONS**

7.      Plaintiff brings this consumer protection and false advertising class action lawsuit against Defendant regarding its misleading business practices with respect to the labeling, marketing, and sale of its Public Goods Sunscreen advertised as "100% reef safe."

8.      Defendant markets and sells a chemical sunscreen with labeling and advertising that leads consumers to believe that the sunscreen is "100% reef safe", when in fact the chemical sunscreen contains active ingredients known to damage coral reefs and the marine life that inhabit them.

9.      Coral reefs are among the most biologically diverse, culturally significant, and economically valuable ecosystems on Earth. They provide nesting grounds and homes for hundreds of species of marine life, help stabilize the sea floor, prevent coastal erosion and storm surge damages, contribute to the mitigation of climate change by regulating carbon dioxide levels in the ocean, promote tourism, support your fresh seafood habit, and filter and clean seawater.[1]

10.      Coral reefs provide billions of dollars in food, jobs, recreational opportunities, coastal protection, and other important goods and services to people around the world.

11.      Yet coral reefs are at danger of going extinct. Nearly ten years ago, the World Resource Institute estimated that more than 60 percent of the world's reefs were under threat from local stressors, like fishing and land-based pollution. The Institute predicted that by the 2030s more than 90 percent of the world's reefs will be threatened due to human activities, with nearly 60 percent facing high, very high, or critical threat levels, and rising to 75 percent by the 2050s.[2]

12.      Since then, the scientific community's predictions have gotten bleaker. A study released at the 2020 San Diego Ocean Sciences Meeting predicts that all of the world's coral reefs will likely be lost by 2100 as "[r]ising sea temperatures, acidic water and pollution are proving too

---

[1] Carrie Bell, *The Best Reef-Safe, Eco-Friendly Sunscreens*, ROLLING STONE, Jul. 1, 2021, https://www.rollingstone.com/product-recommendations/lifestyle/best-reef-safe-sunscreen-1180223/ (last visited June 27, 2022).

[2] *Reefs at Risk Projections: Present, 2030, and 2050*, WORLD RESOURCE INSTITUTE, https://www.wri.org/data/reefs-risk-projections-present-2030-and-2050 (last visited June 27, 2022).

1   much for the reefs to handle."[3]

2       13.    Sunscreen pollution is among the serious threats to coral reefs and the marine life

3 that inhabit them. The sunscreen that you apply does not stay on your skin. When you swim or

4 shower, sunscreen washes off and enters our waterways. It is estimated that each year between

5 4,000 to 6,000 metric tons of sunscreen enter in the oceans from swimmers, snorkelers, and divers.[4]

6       14.    An informational diagram on how sunscreen chemicals enter our oceans and affect

7 the marine environment from the National Oceanic and Atmospheric Administration is provided

8 below:



9
10
11
12
13
14
15
16
17
18
19
20
21
22

23
24       15.    The National Oceanic and Atmospheric Administration reports that the following

25

26 [3] Jordan Davidson, *Coral Reefs Could Be Completely Lost to the Climate Crisis by 2100, New Study Finds*, Ecowatch, Feb. 20, 2020, https://www.ecowatch.com/coral-reefs-climate-crisis-

27 predictions-2645201373.html/ (last visited June 27, 2022).

28 [4] *Why Should I Care About My Sunscreen?*, Coral Safe, https://coralsafe.com/pages/why-should-i-care-about-my-sunscreen (last visited June 27, 2022).

list of chemicals should be avoided due to the harm they pose to marine life:

    a.  3-Benzylidene camphor;

    b.  4-Methylbenzylidene camphor;

    c.  Octrocrylene;

    d.  Benzophenone-1;

    e.  Benzophenone-8;

    f.  OD-PABA;

    g.  Nano-Titanium dioxide;

    h.  Nano-Zinc oxide;

    i.  Octinoxate; and

    j.  Oxybenzone.

16.    The Haereticus Environmental Laboratory (HEL) is a non-profit scientific organization that specializes in research and advocacy in a number of areas including sunscreens and how their ingredients impact natural environmental habitats. The HEL reports that the following lists of chemicals should be avoided due to the harm they pose to coral reefs and marine life:

    a.  Oxybenzone;

    b.  Octinoxate;

    c.  Octocrylene;

    d.  Homosalate;

    e.  4-methylbenzylidene camphor;

    f.  PABA;

    g.  Parabens;

    h.  Triclosan;

    i.  Any nanoparticles or "nano-sized" zinc or titanium; and

    j.  Any form of microplastic.[5]

---

[5] *What Chemicals are on the HEL list?*, HAERETICUS, https://haereticus-lab.org/protect-land-sea-certification-3/ (last visited June 27, 2022).

17.     The following are just some of the ways in which sunscreen chemicals affect corals reefs and the marine life that inhabit them:

   a.  Coral: sunscreen chemicals accumulate in tissues and can induce bleaching, damage DNA, deform young coral reefs, and even kill;

   b.  Green algae: sunscreen chemicals can impair growth and photosynthesis;

   c.  Mussels: sunscreen chemicals can induce defects in young;

   d.  Sea Urchins: sunscreen chemicals can damage immune and reproductive systems, and deform young;

   e.  Fish: sunscreen chemicals can decrease fertility and reproduction, and cause female characteristics in male fish; and

   f.  Dolphins: sunscreen chemicals can accumulate in tissue and be transferred to the young.[6]

18.     Consumers have become increasingly concerned with protecting corals reefs through individual action, including purchasing reef friendly personal care products, in particular sunscreen and skincare products, which are free from chemicals that can harm reefs, including the coral reefs and marine life that inhabits and depends on them. Reef-safe skin care products, such as sunscreens and sun blocks, have quickly rose in popularity due to their perceived positive ecological impact.

19.     To win over consumers and obtain a premium price over their competitors, companies such as the Defendant, have responded in kind by trying to hide, confuse, or play loose with the term "reef safe."

20.     Consumers believe they are purchasing a superior, cleaner, and healthier Product from Defendant because of Defendant's deceptive advertising and labeling of the Product.

21.     Save The Reef, an organization dedicated to saving the world's oceans and marine life states the term "reef friendly" typically means that the sunscreen contains only mineral UV blocking ingredients like oxide and titanium dioxide. The organization advises consumers to avoid

---

[6] *Skincare Chemicals and Coral Reefs,* NATIONAL OCEAN SERVICE, https://oceanservice.noaa.gov/news/sunscreen-corals.html (last visited June 27, 2022).

chemical sunscreens.[7]

22.     Chemical sunscreens generally consist of a combination of different chemical ingredients, primarily oxybenzone, octinoxate, and avobenzone,[8] but also includes other chemicals such as octocrylene and homosalate.[9] Each of these chemicals are known to cause harm to coral reefs and marine life.

23.     **Octocrylene.** Octocrylene is a chemical sunscreen ingredient often used to help stabilize another chemical sunscreen ingredient called avobenzone.[10] Research shows that octocrylene creates compounds that accumulate in coral reefs that in high enough concentrations impair coral metabolism, leaving the coral reef susceptible to bleaching and disease.[11] Researchers have detected octocrylene in dolphins, mussels, and other aquatic organisms.[12] The risk posed by octocrylene to coral reefs is so great in early 2021, a group of 50 organizations, businesses, individuals, and eminent scientists representing more than 1,000 constituents and concerned citizens in Hawaii, submitted testimony and evidence supporting a bill that amends Hawaii Revised Statutes, section 342D-21, banning oxybenzone and octinoxate from inclusion in non-prescription sunscreens sold, offered for sale, or distributed to Hawaii, to likewise ban octocrylene and avobenzone beginning in 2023.[13] The bill successfully passed through its first and second congressional hearings, but no further action has been taken by the Hawaiian Legislature since

---

[7] *Reef Safe Sunscreen Guide*, SAVE THE REEF, https://savethereef.org/about-reef-save-sunscreen.html (last visited June 27, 2022).

[8] *Reef Safe Sun Protection*, SUSTAINABLE TOURISM, https://www.sustainabletourismhawaii.org/reefsafesunscreen/ (last visited June 27, 2022).

[9] *Reef Safe Sunscreen Guide*, SAVE THE REEF, https://savethereef.org/about-reef-save-sunscreen.html (last visited June 27, 2022).

[10] *What is avobenzone and is it safe in sunscreen?*, GODDESS GARDEN, https://www.goddessgarden.com/what-is-avobenzone-and-is-it-safe-in-sunscreen/ (last visited June 27, 2022).

[11] *See* Melisa Pandika, *Common sunscreen ingredient octocrylene might be harmful to coral*, C&EN, Jan. 22, 2019, https://cen.acs.org/environment/water/Common-sunscreen-ingredient-octocrylene-might/97/web/2019/01 (last visited June 27, 2022).

[12] *Id.*

[13] *See* SB132, 2021 Archives, HAWAII STATE LEGISLATURE, https://www.capitol.hawaii.gov/measure_indiv.aspx?billtype=SB&billnumber=132&year=2022 (last visited June 27, 2022).

CLASS ACTION COMPLAINT

March 2021. *Id*. Octocrylene has also been banned in sunscreen products sold in the U.S. Virgin Islands, in Key West, Florida, and the Republic of the Marshall Islands.[14] Octocrylene is also harmful to humans. Studies show that when octocrylene is absorbed through the skin, the chemical releases free radicals; a type of reactive oxygen species (ROS) that can damage skin cells and increase the risk for cancer and other health issues.

24.     **Avobenzone.** Avobenzone, the sunscreen chemical often paired with octocrylene, has the reputation of being the sunscreen industry's replacement for oxybenzone after that sunscreen chemical was banned in several areas. However, avobenzone's and oxybenzone's molecular structures are extremely similar and both have been shown to be harmful to users and waterways, especially over the long term.[15] Avobenzone is a type of petrochemical. Petrochemicals are damaging to coral reefs because they increase the rate of coral bleaching.[16] Like octocrylene, avobenzone is known to cause the release of free radicals that increase cancer risk, accelerates skin aging and contributes to the development of a myriad of allergies. Recent studies also show avobenzone can become toxic to our liver and kidneys when it comes into contact with chlorine. [17]

25.     **Homosalate.** Homosalate is another sunscreen chemical often used with avobenzone in sunscreens.[18] Homosalate is an organic compound that belongs to a class of chemicals called salicylates.[19] The sunscreen chemical does not break down easily and has become increasingly present in the environment.[20] Like octocrylene and avobenzone, homosalate

---

[14] *See U.S. Virgin Islands Bans Sunscreens Harmful to Coral Reefs*, National Parks Traveler, Jul. 9, 2019, https://www.nationalparkstraveler.org/2019/07/us-virgin-islands-bans-sunscreens-harmful-coral-reefs (last visited June 27, 2022).

[15] *Is avobenzone safe in sunscreens,* WAX HEAD, https://gowaxhead.com/blogs/the-thrive-lab/avobenzone-sunscreens (last visited June 27, 2022).

[16] *Id.*

[17] *Id.*

[18] *Is Homosalate Safe?*, WAX HEAD, https://gowaxhead.com/blogs/the-thrive-lab/homosalate-safe (last visited June 27, 2022).

[19] *Homosalate,* CAMPAIGN FOR SAFE COSMETICS, https://www.safecosmetics.org/get-the-facts/chemicals-of-concern/homosalate/ (last visited June 27, 2022).

[20] *Id.*

has also been linked to hormone disruption in humans. A recent study found that in 54 mother-child pairs:

> 85.2% of the breast milk samples contained concentrations of octocrylene and homosalate . . . This is particularly concerning given that homosalate is known to impact the body's hormone system's, particularly the estrogen system. In human breast cancer cells, (which grow and multiply in response to estrogen), homosalate exposure led to 3.5 times more cell growth and multiplication. Sunscreens containing homosalate were also shown to enhance the amount of pesticides absorbed through skin. Hormone disruption and pesticide disruption are also threats to reefs and aquatic organisms who see similar side effects and damage from these compounds.[21]

26.     In 2019, the FDA published a study showing octocrylene, homosalate and avobenzone are all absorbed into the body after a single use. The FDA also found the sunscreen ingredients could be detected on the skin and in blood weeks after application ended.[22]

27.     **Octyl Salicylate.** Another common sunscreen chemical, octyl salicylate, is also found on various lists as an active ingredient to avoid for the safety of coral reefs. Like the other common sunscreen chemicals, octyl salicylate has also been shown to negatively affect human hormones and even cause male infertility.[23]

28.     The proposed bill in Hawaii to ban avobenzone and octocrylene is S.B.132. When S.B.132 passed through the Congressional Committee on Agriculture and Environment, the Committee found "that octocrylene is linked to significant harmful impacts on Hawaii's marine environment and ecosystems, including coral reefs that protect Hawaii's shoreline. Furthermore, as the environmental contamination of octocrylene is constantly refreshed and renewed daily by swimmers and beachgoers who apply sunscreens containing these three chemicals, the contamination persists in Hawaii's coastal waters." The Congressional Committee further found

---

[21] *Reef Safe vs Reef Friendly*, AMAVARA, https://amavara.com/blogs/news/reef-safe-vs-reef-friendly (last visited June 27, 2022).

[22] *Is Homosalate Safe?*, WAX HEAD, https://gowaxhead.com/blogs/the-thrive-lab/homosalate-safe (last visited June 27, 2022).

[23] *Ethylhexyl Salicylate/Octisalate*, CURIOUS CHLORIDE, https://www.curiouschloride.com/substances/ethylhexyl-salicylate/ (last visited Jan. 12, 2022).

CLASS ACTION COMPLAINT

that since the prohibition of oxybenzone and octinoxate in Hawaii, "octocrylene and avobenzone have been shown to be harmful to marine life and human health and should also be kept out of our marine environment. Evolving science around the world clearly demonstrates that these ubiquitous and pervasive reef toxins irreversibly interfere with the life-cycles of Hawaii's foundational and endemic marine life. Furthermore, long-term exposure to avobenzone and octocrylene has been found to be lethal for some organisms living in freshwater environments." [24] The Congressional Committees for Energy & Environmental Protection and for Consumer Protection also made similar findings.[25]

29.     On February 17, 2021, the Department of Land and Natural Resources testified before the congressional committees and provided the following statement:

Octocrylene is now the dominant UV-sunscreen contaminant in coastal waters. Recent scientific studies suggest that octocrylene may have negative impacts in aquatic environments equivalent to oxybenzone (already banned from Hawaii sunscreens). Octocrylene functions as an endocrine disruptor, a metabolism disruptor, and a reproductive disruptor. It has also been shown to reduce the ability of coral symbionts to photosynthesize. Scientific evidence suggests that it can have toxic impacts to a variety of aquatic organisms from corals, to fish, to mammals, to plants.

Octisalate has displayed multiple hormonal disrupting activities with in vitro lab studies. In addition, disruption of mitochondrial membrane function, and possible apoptosis (programed cell death) was found. No coral toxicity studies were found for homosalate, but this chemical has been readily found in reef waters. Lab based studies have shown hormone-receptor disrupting activities in in vitro assays. Lethal and sublethal effects were found when the marine algae (Tetraselmis sp.) was exposed to homosalate, indicating potential impacts to phytoplankton communities. This highlights concerns that it could affect corals and suggests the need for testing for these potential the effects. Both homosalate and octisalate are teratogens, which are known to cause embryonic development defects in mammals, fish, and larvae. As a result of these recent scientific findings, we feel that prohibiting the sale of products containing homosalate, octocrylene, and octisalate would likely benefit

---

[24]   Source: Hawaii Committee on Agriculture and Environment, Hearing on S.B.132, https://www.capitol.hawaii.gov/session2021/CommReports/SB132_SD1_SSCR464_.htm (last visited June 27, 2022).
[25]   Source: Committee on Energy & Environmental Protection, Hearing on S.B. 132, https://www.capitol.hawaii.gov/session2021/CommReports/SB132_HD1_HSCR1009_.htm; *see also* Committee on Commerce and Consumer Protection, Hearing on S.B. 132 (last visited June 27, 2022).

CLASS ACTION COMPLAINT

the health and resiliency of Hawaiʻi's coral reef ecosystems.

The Department supports the use of sunscreens that do not contain chemicals that are harmful to marine life, as well as sun protective clothing, as alternatives. The Department continues to conduct outreach efforts to help the public understand the issues regarding using oxybenzone and similar chemicals in the ocean so they can be better informed and make better choices regarding sun protection. These efforts include information on the Department's Division of Aquatic Resources website, focused one-on-one outreach, news releases, videos, interaction with partner organizations, and meetings with boat tour operators and vendors who sell sunscreen. The Department continues to explore other ways to inform the public on this issue.[26]

30.    On February 21, 2019, the FDA issued a proposed rule in which it proposed to take all sunscreen ingredients, except for zinc oxide and titanium oxide, off of the list of chemicals generally recognized as safe and effective (GRASE) for use in sunscreens due to insufficient data of its safety and effectiveness.[27]

31.    The FDA finalized its proposed order on September 24, 2021. The order states that sunscreens containing octocrylene, avobenzone, homosalate, or octisalate **do not** have GRASE status because additional data is needed to show that these sunscreens are GRASE.[28]

32.    Defendant's chemical sunscreen is sold and advertised as "100% reef safe" and "more eco-friendly than other reef-safe sprays on the market," yet contains avobenzone, octocrylene, and octisalate, chemicals shown to harm marine life. Defendant's sunscreen product is falsely advertised to consumers who purchase the sunscreen product at a premium in reliance on Defendant's false and deceptive advertising.

---

[26] Testimony of Suzanne D. Case in consideration of Senate Bill 132, Feb. 17, 2021, https://www.capitol.hawaii.gov/Archives/measure_indiv_Archives.aspx?billtype=SB&billnumber=132&year=2021.

[27] *FDA Fact Sheet – FDA Proposed Rule: Sunscreen Drug Products for over-the-counter-human use; proposal to amend and lift stay on monograph*, FDA, https://www.fda.gov/media/124655/download.

[28] *Questions and Answers: FDA posts deemed final order and proposed order for over-the-counter sunscreen*, FDA, https://www.fda.gov/drugs/understanding-over-counter-medicines/questions-and-answers-fda-posts-deemed-final-order-and-proposed-order-over-counter-sunscreen#:~:text=Based%20on%20new%20data%20and,the%20evidence%20shows%20that%20these.

33.     Defendant's website contains the tagline "you don't need to be a superhero to save the planet; we believe that together our small choices can make a big impact" with a picture of an ocean in the background.[29] This tagline is counter intuitive to Defendant creating, branding, advertising, and selling a sunscreen that contains chemicals harmful to the marine environment and coral reefs.

34.     By advertising the sunscreen product as "100% reef safe" and advertising that its products are "good for people and the planet," yet using active chemical ingredients that are known to cause reef and marine damage, Defendant deceives customers who rely on its representations.

35.     Defendant makes a profit from consumers who attempt to be ecologically conscious and pay a higher price for sunscreen products to accomplish this goal.

36.     The chemical sunscreen at issue (herein after referred to as "the Product") bears labeling and advertising stating "100% reef safe," and "sea safe, skin safe" yet contains avobenzone, octisalate, and octocrylene, all chemicals that are harmful to coral reefs and marine life.

37.     The Product is sold online through the Public Goods website at a price of $12.95 for a 6 oz can of the spray sunscreen. Public Goods also charges a membership fee of $79 per year to purchase products from the brand.  Defendant deceptively labels, advertises, and packages the Product to target a growing consumer interest in purchasing cleaner products that would not cause or potentially cause harm to coral reefs or other marine life.

38.     The Public Goods website targets consumers looking to buy clean, sustainable, healthy products. Many of the shoppers who tend to purchase natural or organic products tend to pay more for such products.

39.     Public Goods charges a membership fee, misleading consumers to believe the products sold by Defendant are "premium," clean products because of the surcharge. Defendant creates the surcharge by requiring a membership to access and purchase Defendant's products. In

[29] *See* https://www.publicgoods.com/pages/about-us (last visited June 27, 2022).

1   return for a membership fee, consumers are promised access to "hundreds of premium products

2   at wholesale prices." *See* https://wholesale.publicgoods.com/ (last visited June 28, 2022).

3          40.     Defendant deceives consumers looking to buy healthy, environmentally friendly

4   products.

5          41.     Below is a true and correct copy of an image of an advertisement of the Product

6   via newsletter from Milled.com, a search engine for e-mail newsletters. This newsletter was

7   published on or around May 28, 2021. The advertisement claims the Product "is designed to

8   protect you and protect our seas," and "contains naturally derived ingredients that nourish your

9   skin," while failing to mention the Product contains harmful chemicals that do the opposite of

10  protecting the sea. *See* https://milled.com/public-goods/spf-50-sunscreen-spray-is-here-QJ4mh-

11  D9_lU5W1Ax (last visited June 28, 2022).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



14

42.     Below is a true and correct copy of a screenshot of the Public Goods website, www.publicgoods.com (the "Website"), where consumers can buy the Product. On this page, consumers can view the ingredients in the Product. Defendant does not disclose that three active ingredients in the Product are harmful chemicals that are not reef safe.



Our SPF 50 sunscreen spray has it all. It's broad-spectrum (fights against UVA and UVB rays), 100% reef safe, and contains naturally derived ingredients that nourish your skin while protecting it (hello, aloe and avocado oil). Our clean formula goes on completely clear, so you won't have to battle thick white paste or bother with rubbing it in. Our sunscreen spray is also free of homosalate, making it even more eco-friendly than other reef-safe sprays on the market. Apply liberally and always keep a bottle handy so you can play in the sunshine and the sunshine doesn't play you.

**What's in it:** Avobenzone 3%, octisalate 5%, octocrylene 8%, aloe, and avocado oil.

**What's not in it:** Oxybenzone, octinoxate, homosalate.

**It's all good:** Our sunscreen spray is SPF 50 and water-resistant for 80 minutes.

Made in USA

43.     A reasonable consumer would not know from looking at the page above on Defendant's Website that the Product contains chemicals that are harmful to coral reefs and marine life. Defendant falsely claims the Product has a "clean formula" and makes the distinction between the chemicals that are and are not in the Product, leading reasonable consumers to believe the chemicals used in the Product are "eco-friendly" as advertised.

44.     The "About" tab on the Public Goods Website directs users to a page with the large graphic posted below. (https://www.publicgoods.com/pages/about-us). The image of waves on a beach with the words, "You don't need to be a superhero to save the planet" leads consumers to believe the products sold by Public Goods would not harm the planet, or more specifically based on the ocean in the graphic, would not harm marine life.



45.     Defendant advertises the Product as "sea safe" and "skin safe" although the Product contains harsh chemicals that harm the ocean environment. Despite advertising the Product as "safe" and not containing "harsh chemicals… which are proven to be destructive to the environment," Defendant's sunscreen contains the harmful chemicals avobenzone and octocrylene.   *See*   https://milled.com/public-goods/spf-50-sunscreen-spray-is-here-QJ4mh-D9_lU5W1Ax (last visited June 28, 2022).

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16   46.     As the entity responsible for development, manufacturing, packaging, advertising,

17   distribution, and sale of the Product, Defendant knew or should have known that the Product's

18   advertising falsely and deceptively misrepresents that the Product is "100% reef safe."

19   47.     Defendant posted a blog article on Defendant's Website that admits the chemicals

20   octocrylene, homosalate, and octisalate could be "detrimental to marine life." [30] The blog post

21   titled, "The Ultimate Guide to Reef-Safe Sunscreen: 6 of the Best Sunscreen Brands," cites that

22   "eliminating oxybenzone and octinoxate [from sunscreens] might only be one step," and that

23   "other common sunscreen ingredients that could be detrimental to marine life" are octocrylene,

24   homosalate, and octisalate, according to Craig Downs, the Executive Director of Haereticus

25   Environmental Laboratory. *Id*.

26   ────────────

27   [30] *The Ultimate Guide to Reef-Safe Sunscreen: 6 of the Best sunscreen brands*, PUBLIC GOODS,
https://blog.publicgoods.com/what-makes-sunscreen-reef-safe/ (last visited June 23, 2022).

28

CLASS ACTION COMPLAINT

48.     The same blog on Defendant's Website also contains an article titled "6 Reef-Safe Sunscreen Brands." The first sunscreen on the list is Defendant's Product, the Public Goods Sunscreen. The blog post mentions the Public Goods "mineral sunscreen" is "sourced from 100% natural ingredients and safe enough to lather on your baby," even though Defendant's sunscreen contains both octisalate and octocrylene, two of the three chemicals cited as being harmful to marine life in the same blog post just a few sentences prior. *Id.*

49.     The same article also claims Public Goods "formulated this sunscreen to protect your skin from UV rays without using hazardous chemicals that could harm both coral reefs and human beings," and that Defendant's sunscreen contains "all-natural ingredients like jojoba oil, chamomile, and lemon balm." *Id.* The post fails to mention Defendant's sunscreen actually does contain chemicals that are harmful to coral reefs.

50.     Another article on Defendant's blog titled, "Titanium Dioxide: A Closer Look at This Sunscreen Ingredient" admits that the FDA considers titanium dioxide and zinc oxide to be the two safest sunscreen ingredients. The post also admits the FDA "says that many other sunscreen ingredients need more research and information to determine how safe they truly are. Those ingredients are really the ones under fire for being absorbed into the bloodstream." Some of those "other… ingredients" are the same ones Defendant uses in the Product. [31]

51.     Defendant knows or should have known that the chemicals used in the Product are harmful to the environment and the human body because in the blog post on Defendant's website titled, "How Your Sunscreen is Harming the Environment — And Possibly You, Too" the author of the post writes, "When you search for reef-safe sunscreen, check the ingredients list instead of trusting labels, as there is no regulation on the label 'reef-safe.' Look for sunscreen without the ingredients oxybenzone, octinoxate, homosalate, octocrylene and avobenzone." [32]

---

[31] *Titanium Dioxide: A Closer Look at This Sunscreen Ingredient*, PUBLIC GOODS, https://blog.publicgoods.com/titanium-dioxide/ (last visited June 23, 2022).
[32]     *How Your Sunscreen is Harming the Environment — And Possibly You, Too*, PUBLIC GOODS,   https://blog.publicgoods.com/how-your-sunscreen-is-harming-the-environment-and-possibly-you-too/ (last visited June 27, 2022).

CLASS ACTION COMPLAINT

Defendant's Product contains two harmful chemicals from the list of ingredients to avoid while simultaneously claiming the Product is "100% reef safe" and good for the planet.

52.   Defendant knows, knew, or should have known, that Plaintiff and other ecologically conscientious consumers did and would rely on Defendant's labeling, packaging, and advertising of the Product before purchasing the Product.

53.   Plaintiff and other reasonable consumers did not know, and had no reason to know, that the Product contains ingredients harmful to coral reefs and other marine life. The Product is marketed to consumers as part of a brand that practices sustainability, advertises its products as "devoid of harmful chemicals," and markets its sunscreen product as "100% reef safe."  The membership fee Defendant charges consumers to purchase the Product further leads reasonable consumers to believe Defendant's products are healthy, natural, and reef-safe.

54.   There is no disclaimer or other statement on the Product's label or Defendant's Website indicating that some ingredients in the Product are actually not safe for coral reefs and other marine life. Moreover, even if a reasonable consumer was to read the ingredient list, a reasonable consumer would not know whether octocrylene or avobenzone are in fact reef safe or not, especially because Defendant advertises the Product as being safe and unharmful to coral reefs.

55.   Because the Product is not "100% reef safe" as reasonably expected by Plaintiff and other consumers, Defendant's marketing of the Product was and continues to be misleading and deceptive.

56.   Moreover, by deceptively labeling the Product as "100% reef safe," Defendant is in violation of FDA regulations, which prohibit "claims that would be false and/or misleading on sunscreen products." 21 C.F.R. § 201.327(g).

57.   Each consumer has been exposed to the same or substantially similar deceptive practices because: (1) the chemical sunscreen Product is advertised as "100% reef safe" and (2) the chemical sunscreen Product contains at least two active ingredients, avobenzone and octocrylene, that are harmful to coral reefs and marine life.

58.     Plaintiff and other consumers paid an unlawful premium for the sunscreen Product they were made to believe was "100% reef safe." Defendant's Product, which is sold online on Defendant's website, is consistently advertised as "clean," "sustainable," "healthy," and "cruelty-free," and leads reasonable consumers to believe the Product is part of a brand that sells genuinely clean and safe products, not a brand that falsely claims its products are "healthy" and "clean."

59.     Plaintiff and other consumers would have paid significantly less for the Product had they known that the Product contained active ingredients that would harm coral reefs and marine life. Therefore, Plaintiff and other consumers purchasing the Product suffered injury in fact and lost money as a result of Defendant's false, unfair, and fraudulent practices, as described herein.

60.     Defendant should be enjoined from deceptively representing that the Product is "100% reef safe." Defendant should also be required to pay for all damages resulting from its deceptive and misleading advertising.

## PLAINTIFF'S INDIVIDUAL ALLEGATIONS

61.     On or around June 9, 2022, Plaintiff Joseph Casillas purchased Public Goods SPF 50 spray sunscreen for personal use from www.publicgoods.com for approximately $12.95.

62.     Plaintiff Casillas is eco-conscious and wanted a product that had clean chemicals and was reef-safe.

63.     After reviewing the packaging and advertising for the Product, Plaintiff Casillas believed the Product was reef-safe as advertised.

64.     After Plaintiff Casillas created a membership account with Defendant on or around June 9, 2022, Defendant sent Plaintiff Casillas an email stating that Defendant provides "healthy products for you and the planet." A true and correct copy of the e-mail Plaintiff Casillas received is shown below.



  





CLASS ACTION COMPLAINT

65.    A true and correct copy of the front-label of the Public Goods sunscreen Product purchased by Plaintiff Casillas shown below.



66.    The rear-label of the Product purchased by Plaintiff Casillas advertises that the



CLASS ACTION COMPLAINT

Product is "RF reef friendly."  A true and correct copy of the rear-label of the Public Goods Sunscreen product purchased by Plaintiff Casillas is shown below.

**What's in it:** Avobenzone 3%, octisalate 5%, octocrylene 8%, aloe, and avocado oil.

67.     The Product purchased by the Plaintiff contains the harmful ingredients avobenzone, octocrylene, and octisalate. There is only one type of sunscreen sold by Defendant on Defendant's Website which is the Product that contains the harmful chemicals listed.

68.     Plaintiff Casillas did not know, and had no reason to know, that the Product he purchased contained active ingredients that are harmful to coral reefs and other marine life.

69.     Plaintiff Casillas relied on Defendant's advertising boasting the product as reef friendly and Plaintiff Casillas did not know that the active ingredients in the Product he purchased have been shown to be harmful to coral and marine life.

70.     Plaintiff Casillas paid an unlawful premium for the product advertised as reef friendly when it in fact is not safe for coral reefs and marine life.

71.     Plaintiff Casillas would not have purchased the Product, or would not have purchased the Product for the same price, had the Product been truthfully advertised and thus, because of Defendant's misleading business practices, Plaintiff Casillas was harmed and suffered injury in fact and lost money as a result of Defendant's false, unfair and fraudulent practices.

72.     Plaintiff Casillas intends to, desires to, and will purchase the Product again when he can do so with the assurance that the Product's label and advertising, which indicate that the Product is "100% reef safe," is lawful and consistent with the Product's ingredients.

## CLASS ALLEGATIONS

73.     Plaintiff brings this class action lawsuit individually and on behalf of the following proposed class and subclass under Rule 23 of the Federal Rules of Civil Procedure:

**Nationwide Class**: All persons within the United States, within the applicable limitations period, who purchased the Product for personal and household use and not for resale.

**California Subclass**: All persons within California, within the applicable limitations period, who purchased the Product for personal and household use and not for resale.

74.     Excluded from the classes are the following individuals: officers and directors of Defendant and its parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

75.     Plaintiff reserves the right to modify or amend the definitions of the proposed class before the Court determines whether certification is appropriate.

76.     <u>Numerosity</u>. The members of the Class are so numerous that a joinder of all members is impracticable. While the exact number of class members is unknown to Plaintiff at this time, Plaintiff believes the class numbers in the thousands, if not more.

77.     <u>Typicality</u>. Plaintiff's claims are typical of the claims of the Class members because, among other things, Plaintiff sustained similar injuries to that of class members as a result of Defendant's uniform wrongful conduct, and their legal claims all arise from the same events and wrongful conduct by Defendant.

78.     <u>Adequacy</u>. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff's interests do not conflict with the interests of the Class members and Plaintiff has retained counsel experienced in complex class action cases to prosecute this case on behalf of the class.

79.     <u>Commonality</u>. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the class, including the following:

        a.   Whether Defendant engaged in the course of conduct alleged herein;

        b.   Whether Defendant's conduct is likely to deceive a reasonable consumer;

        c.   Whether Defendant's conduct constitutes an unfair or deceptive act or practice;

d.  Whether Defendant violated the consumer protection statutes set forth below;

e.  Whether Plaintiff and the class members are entitled to restitution pursuant to the UCL;

f.  Whether Defendant's uniform acts and practices violate the CLRA;

g.  Whether, as a result of Defendant's conduct, Plaintiff and the Class members suffered injury; and

h.  The nature of the relief, including equitable relief, to which Plaintiff and class members are entitled.

80.  <u>Predominance</u>. The common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class. The Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's conduct.

81.  <u>Superiority</u>. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since a joinder of all members is impracticable. Furthermore, as damages suffered by Class members may be relatively small, the expense and burden of individual litigation make it impossible for class members to individually redress the wrongs done to them. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

82.  Accordingly, this class action is properly brought and should be maintained as a class action because questions of law or fact common to Class members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

83.  This class action is also properly brought and should be maintained as a class action because Plaintiff seeks injunctive relief and declaratory relief on behalf of the Class members on

1  grounds generally applicable to the proposed class. Certification is appropriate because Defendant

2  has acted or refused to act in a manner that applies generally to the proposed class, making final

3  declaratory or injunctive relief appropriate.

4  <u>**FIRST CAUSE OF ACTION**</u>

5  **Violation of the California's Unfair Competition Law**

6  **Cal. Bus. & Prof. Code §§ 17200,** *et seq.*

7  ***(On Behalf of Plaintiff and the California Subclass)***

8  84.    Plaintiff re-alleges and incorporates by reference each and every allegation

9  contained elsewhere in this Complaint as if fully set forth herein.

10  85.    Defendant is subject to California's Unfair Competition Law, Cal. Bus. & Prof.

11  Code §§ 17200, *et seq*. The UCL provides, in pertinent part: "Unfair competition shall mean and

12  include unlawful, unfair or fraudulent business practices…"

13  **Unfair Prong**

14  86.    The UCL prohibits "unfair competition," which is broadly defined as including

15  "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or

16  misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of

17  Part 3 of Division 7 of the Business and Professions Code." Cal. Bus. & Prof. Code §17200.

18  87.    Defendant's business practices, described herein, violated the "unfair" prong of the

19  UCL in that its conduct is substantially injurious to consumers, offends public policy, and is

20  immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any

21  alleged benefits.

22  88.    Defendant has made material misrepresentations and omissions, both directly and

23  indirectly, related to its Product advertised as "100% reef safe."  Defendant's conduct was and

24  continues to be of no benefit to purchasers of the Product, as it is misleading, unfair, unlawful and

25  is injurious to consumers who purchased the Product and were deceived by Defendant's

26  misrepresentations.  Deceiving consumers about the Product's impact on the environment is of no

27  benefit to consumers.  Therefore, Defendant's conduct was and continues to be "unfair."

28

89.     Defendant's conduct with respect to the labeling, advertising, and sale of the Product was and is also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumer themselves could reasonably have avoided.

90.     Plaintiff and members of the Class are likely to continue to be damaged by Defendant's deceptive trade practices, because Defendant continues to disseminate misleading information on the Product's packaging and advertising. Thus, public injunctive relief enjoining Defendant's deceptive practices is proper, as monetary damages or any other alternatives alone are an inadequate remedy at law to prevent the ongoing harm to the environment or to prevent the harm to future consumers who are fooled by the same deceptive business practices.

91.     There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.  Many sunscreen brands do not contain these harmful chemicals and are actually "Reef Safe," so Defendant has the ability to manufacture "Reef Safe" Products.

92.     As such, Defendant has engaged in unfair or deceptive acts in violation of the UCL.

93.     Defendant is aware of the violations but has failed to adequately and affirmatively take steps to cure the misconduct.

94.     Defendant's conduct caused and continues to cause substantial injury to Plaintiff and other class members.  Plaintiff has suffered injury in fact as a result of Defendant's unfair conduct.  Defendant has thus engaged in unlawful, unfair, and fraudulent business practices and false advertising, entitling Plaintiff and the Class to public injunctive relief against Defendant.

95.     Pursuant to Business and Professional Code § 17203, Plaintiff and the Class seek an order requiring Defendant to immediately cease such acts of unlawful, unfair, and fraudulent business practices and requiring Defendant to engage in a corrective advertising campaign.

**Fraudulent Prong**

96.      Under the "fraudulent" prong, a business practice is prohibited if it is likely to mislead or deceive a reasonable consumer or, where the business practice is aimed at a particularly

susceptible audience, a reasonable member of that target audience. *See Lavie v. Proctor & Gamble Co.,* 105 Cal.App.4th 496, 506-07 (2003).

97.     Defendant committed "fraudulent" business acts or practices by, among other things, engaging in conduct Defendant knew or should have known was likely to and did deceive reasonable consumers, including Plaintiff and the members of the Class. By relying on Defendant's false and misleading representations indicating the Product is "100% reef safe," Plaintiff and the other members of the Class purchased the Product. Moreover, based on the materiality of Defendant's fraudulent and misleading conduct, reliance on such conduct as a material reason for the decision to purchase the Product may be presumed or inferred for Plaintiff and members of the Class.

98.     Defendant knew or should have known that its labeling and marketing of the Product would likely deceive reasonable consumers.

99.     Plaintiff and Class members acted reasonably when they paid money for Defendant's Product which they believed to be of higher price point because of truthful representations.

**Unlawful Prong**

100.     Under the UCL, a business act or practice is "unlawful" if it violates any established state or federal law.

101.     Defendant's business practices, described herein, violated the "unlawful" prong of the UCL by violating the Consumers Legal Remedies Act, the False Advertising Law, and 21 C.F.R. § 201.327(g). Defendant's conduct also constitutes a breach of warranty. On account of each of these violations of law, Defendant has also violated the "unlawful" prong of the UCL. Such conduct is ongoing and continues to this date.

102.     In accordance with California Business & Professions Code §17203, Plaintiff seeks an order: (1) enjoining Defendant from continuing to conduct business through its fraudulent conduct; and (2) requiring Defendant to conduct truthful and transparent marketing of its products.

103.     As a result of Defendant's conduct, Plaintiff seeks restitution, disgorgement, and

injunctive relief under California Business & Professions Code §17203.

## SECOND CAUSE OF ACTION

### Violation of the California's Consumers Legal Remedies Act

### Cal. Bus. & Prof. Code §§ 1750, *et seq.*

### *(On Behalf of Plaintiff and the California Subclass)*

104.    Plaintiff re-alleges and incorporates by reference each and every allegation contained elsewhere in this Complaint as if fully set forth herein.

105.    The Product is a "good" within the meaning of Cal. Civ. Code § 1761(a), and the purchase of such Product by Plaintiff and members of the California Subclass constitute "transactions" within the meaning of Cal. Civ. Code § 1761(e).

106.    Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have. . ." By marketing the Product with its current label and advertisements, Defendant has represented and continues to represent that the Product has characteristics (i.e., is 100% reef-safe) when they are not safe for reefs. Therefore, Defendant has violated section 1770(a)(5) of the CLRA.

107.    Cal. Civ. Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." By marketing the Product with its current label and advertisements, Defendant has represented and continues to represent that the Product is of a particular standard (i.e., 100% reef safe) when it does not meet this standard. Therefore, Defendant has violated section 1770(a)(7) of the CLRA.

108.    Cal. Civ. Code § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised." By labeling, packaging, and marketing the Product as "Reef Friendly" and "100% reef safe" so that a reasonable consumer would believe the Product is "Reef Friendly," and then intentionally not selling a Product that is "Reef Friendly," Defendant has violated section 1770(a)(9) of the CLRA.

109.    Defendant also violated the CLRA by intentionally failing to disclose that the Product contains three active ingredients that cause or can cause damage to coral reefs and marine life.

110.    At all relevant times, Defendant has known or reasonably should have known that the Product is not "Reef Friendly," and that Plaintiff and other members of the California Subclass would reasonably and justifiably rely on that representation in purchasing the Product.

111.    Plaintiff and members of the California Subclass have reasonably and justifiably relied on Defendant's misleading and fraudulent conduct when purchasing the Product. Moreover, based on the materiality of Defendant's fraudulent and misleading conduct, reliance on such conduct as a material reason for the decision to purchase the Product may be presumed or inferred for Plaintiff and members of the California Subclass.

112.    Plaintiff and members of the California Subclass have suffered and continue to suffer injuries caused by Defendant because they would not have purchased the Product or would have paid significantly less for the Product had they known that Defendant's conduct was misleading and fraudulent.

113.    Under Cal. Civ. Code § 1780(a), Plaintiff and members of the California Subclass seek injunctive relief pursuant to the CLRA, preventing Defendant from further wrongful acts and unfair and unlawful business practices.

114.    Pursuant to Cal. Civ. Code § 1782, on June 29, 2022, counsel for Plaintiff mailed a notice and demand letter by certified mail, with return receipt requested, to Defendant. The CLRA letter provided notice of Defendant's violations of the CLRA and demanded that Defendant correct, repair, replace, or otherwise rectify the unlawful, unfair, false, and deceptive practices complained of herein.  If Defendant fails to take corrective action after thirty days of the date of Plaintiff's CLRA letter, Plaintiff will amend to seek damages under the CLRA.

115.    In accordance with Cal. Civ. Code § 1780(d), Plaintiff's CLRA venue declaration is attached hereto as Exhibit A.

1

2

3

4

## THIRD CAUSE OF ACTION

**False Advertising**

**Cal. Bus. & Prof. Code §§ 17500 *et seq.* and 17535**

*(On Behalf of Plaintiff and the California Subclass)*

5     116.    Plaintiff re-alleges and incorporates by reference each and every allegation

6     contained elsewhere in this Complaint as if fully set forth herein.

7     117.    Plaintiff brings this claim individually and on behalf of the members of the Class.

8     118.    The False Advertising Law prohibits advertising "which is untrue or misleading,

9     and which is known, or which by the exercise of reasonable care should be known, to be untrue or

10    misleading." Cal. Bus. & Prof. Code § 17500.

11    119.    As detailed above, Defendant's marketing and sale of the Product as "100% reef

12    safe" is likely to deceive a reasonable consumer because the Product contains ingredients that are

13    harmful to coral reefs and other marine life.

14    120.    In reliance on Defendant's false and misleading representations indicating the

15    Product is "100% reef safe," Plaintiff and members of the Class purchased the Product. Based on

16    the materiality of Defendant's fraudulent and misleading conduct, reliance on such conduct as a

17    material reason for the decision to purchase the Product may be presumed or inferred for Plaintiff

18    and the members of the Class.

19    121.    Defendant knew or should have known that its labeling and marketing of the

20    Product was likely to deceive a reasonable consumer.

21    122.    Defendant profited from its sale of the falsely and deceptively advertised Product

22    to unwary customers. As a result, Plaintiff, the Class, and the general public are entitled to public

23    injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which

24    Defendant was unjustly enriched.

25    123.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff, on behalf of himself and the

26    Class, seeks an order enjoining Defendant from continuing to engage in deceptive business

27    practices, false advertising, and any other act prohibited by law, including those set forth in this

28

1   Complaint.

2       124.    Plaintiff and members of the Class request that the Court order Defendant to restore

3   fraudulently obtained money to Plaintiff and members of the Class, disgorge the profits Defendant

4   made on these transactions, and enjoin Defendant from violating the False Advertising Law as

5   discussed herein. Otherwise, Plaintiff and members of the Class may be irreparably harmed and/or

6   denied an effective and complete remedy if such an order is not granted.

7                                   **FOURTH CAUSE OF ACTION**

8                                   **Breach of Express Warranty**

9                                   **California Commercial Code § 2312**

10                  ***(On Behalf of Plaintiff, the Nationwide Class and California Subclass)***

11      125.    Plaintiff re-alleges and incorporates by reference each and every allegation

12  contained elsewhere in this Complaint as if fully set forth herein.

13      126.    California Commercial Code § 2313 provides that "(a) Any affirmation of fact or

14  promise made by the seller to the buyer which relates to the goods and becomes part of the basis

15  of the bargain creates an express warranty that the goods shall conform to the affirmation or

16  promise," and "(b) Any description of the goods which is made part of the basis of the bargain

17  creates an express warranty that the goods shall conform to the description." Cal. Com. Code §

18  2313.

19      127.    Defendant has expressly warranted on the packaging of the Product that it is "Reef

20  Friendly." Defendant also expressly warranted on its Website that the Product is "100% Reef

21  Safe." These representations about the Product: (1) are affirmations of facts and promises made

22  by Defendant to consumers that the Product is in fact "Reef Friendly" and "100% Reef Safe;" (2)

23  became part of the basis of the bargain to purchase the Product when Plaintiff relied on the

24  representations; and (3) created an express warranty that the Product would conform to the

25  affirmations of facts or promises. In the alternative, the representations about the Product are a

26  description of goods which were made as part of the basis of the bargain to purchase the Product,

27  and created an express warranty that the Product would conform to the Product's representations.

28

128.    Plaintiff and members of the Class reasonably and justifiably relied on the foregoing express warranties, believing that the Product did in fact conform to the warranties.

129.    Defendant has breached the express warranties made to Plaintiff and members of the Class by selling the Product, which contains ingredients that are not reef friendly or reef safe.

130.    Plaintiff and members of the Class paid a price premium for the Product but did not obtain the full value of the Product as represented. If Plaintiff and members of the Class had known of the true nature of the Product, they would not have purchased the Product or would not have been willing to pay the price premium associated with the Product.

131.    As a result, Plaintiff and the Class suffered injury and deserve to recover all damages afforded under the law.

### FIFTH CAUSE OF ACTION

**Breach of Implied Warranty**

**California Commercial Code § 2314**

***(On Behalf of Plaintiff, the Nationwide Class and California Subclass)***

132.    Plaintiff re-alleges and incorporates by reference each and every allegation contained elsewhere in this Complaint as if fully set forth herein.

133.    California's implied warranty of merchantability statute provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Cal. Com. Code § 2314(1).

134.    California's implied warranty of merchantability statute also provides that "[g]oods to be merchantable must be at least such as . . . (f) [c]onform to the promises or affirmations of fact made on the container or label if any." Cal. Com. Code § 2314(2)(f).

135.    Defendant is a merchant with respect to the sale of sunscreen and other skin care products, including the Product. Therefore, a warranty of merchantability is implied in every contract for sale of the Product to California consumers.

136.    By advertising the Product with the current labeling, Defendant made a promise on the label of the Product that the Product is "Reef Friendly," and made a promise on its website that

the Product is "100% reef safe" as well as "eco-friendly." But the Product has not "conformed to the promises . . . made on the container or label" because it is not "Reef Friendly," "100% reef safe," or "eco-friendly" as outlined above. Plaintiff, as well as other class members, did not receive the good as impliedly warranted by Defendant to be merchantable.

137.    Therefore, the Product is not merchantable and Defendant has breached its implied warranty of merchantability in regard to the Product.

138.    If Plaintiff and members of the Class had known that the Product was not "Reef Friendly," they would not have been willing to pay the premium price associated with it or would not have purchased it at all. Therefore, as a direct and/or indirect result of Defendant's breach, Plaintiff and members of the Class have suffered injury and deserve to recover all damages afforded under the law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all Class members proposed in this Complaint, respectfully requests that the Court enter a judgment in his favor and against Defendant, as follows:

139.    Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and appointing him and his Counsel to represent the Class;

140.    Requiring Defendant to bear the cost of Class notice;

141.    Finding Defendant's conduct was unlawful as alleged herein;

142.    Enjoining Defendant from engaging in the wrongful conduct complained of herein for violations of the CLRA;

143.    Requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

144.    Awarding Plaintiff and Class members actual damages, compensatory damages, punitive damages, statutory damages, and statutory penalties, in an amount to be determined;

145.    Awarding Plaintiff and Class members costs of suit and attorneys' fees, as allowable by law; and

146.    Granting such other and further relief as the Court may deem proper.

**DEMAND FOR JURY TRIAL**

147.    Plaintiff hereby demands a trial by jury of all issues so triable.


Dated: July 1, 2022                          Respectfully submitted,


                                            */s/ Ronald A. Marron*
                                            Ronald A. Marron
                                            **LAW OFFICES OF RONALD A. MARRON**
                                            RONALD A. MARRON
                                            *ron@consumersadvocates.com*
                                            ALEXIS M. WOOD
                                            *alexis@consumersadvocates.com*
                                            KAS L. GALLUCCI
                                            *kas@consumersadvocates.com*
                                            LILACH HALPERIN
                                            *lilach@consumersadvocates.com*
                                            651 Arroyo Drive
                                            San Diego, California 92103
                                            Telephone: (619) 696-9006
                                            Facsimile: (619) 564-6665

                                            ***Attorneys for Plaintiff and the Proposed
                                            Class***